STATE of Missouri, Respondent,

v.

Randall B. KNESE, Appellant.

No. 80225.

Supreme Court of Missouri,
En Banc.

Feb. 9, 1999.

Rehearing Denied March 9, 1999.

Melinda K. Pendergraph, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Daniel W. Follett, Asst. Atty. Gen., Jefferson City, for Respondent.

RONNIE L. WHITE, Judge.

Randall Knese appeals from his convictions for the attempted forcible rape[1] and first degree murder[2] of his wife, Karin Knese, and from the death sentence imposed for the

---

1. Section 566.030, RSMo 1994.

2. Section 565.020, RSMo 1994.

latter crime. Mr. Knese raises fifteen points of error. We affirm.

On the morning of March 23, 1996, one of Mr. Knese's neighbors heard a dog barking across the street and then a man yelling. When the neighbor went to her kitchen door to see what was going on, Mr. Knese, wearing only a pair of sweatpants pulled down around his ankles, opened the front door, ran into the neighbor's house and landed on the couch. Mr. Knese then stood, pulled up his pants, and came into the kitchen, where he and the neighbor began to yell at each other. When the neighbor's boyfriend came into the kitchen, Mr. Knese ran into the bedroom and sat on the television. After then going into the bathroom, Mr. Knese came back into the kitchen and then ran outside.

Another neighbor saw Mr. Knese standing outside, holding a broom and screaming. When the neighbor drove closer to where Mr. Knese was standing, Mr. Knese jumped on the hood of the car. The neighbor noticed that Mr. Knese had some scratches on his face, but did not otherwise appear to be injured. Mr. Knese slid off the hood and opened the passenger-side door. The car gained speed, however; and before Mr. Knese was able to get inside the car, he was dragged along the car's side until he eventually let go. The neighbor who was driving the car called the police when she arrived at work.

The police found Mr. Knese lying in the road and noticed that he was bloody and had multiple cuts and abrasions. When asked how he sustained the injuries, Mr. Knese originally said that the "devil had come to get him." He later said that "the bitch tried to kill" him. Mr. Knese also told a paramedic that he did not want to be treated differently for what he had done. Mr. Knese was then taken to the hospital.

While one police officer had been taking care of Mr. Knese in the road, another officer investigated Mr. Knese's home. From the front porch of the home, that officer saw Karin Knese lying motionless on the floor. Her body was partially nude, with her legs spread apart. The officer found no pulse or other signs of life. A paramedic later pronounced Ms. Knese dead.

At the hospital, the police advised Mr. Knese of his *Miranda* rights, and Mr. Knese waived them. Mr. Knese made four statements about the events that had occurred earlier in the day. The police audiotaped one of the statements. Throughout these statements, Mr. Knese admitted to killing his wife. According to Mr. Knese, his wife had taken their child and visited Ms. Knese's sister-in-law the night before, because Ms. Knese was angry about Mr. Knese's drug use. When she returned, she told Mr. Knese that she wanted him to leave their home. They both then went to sleep in separate rooms; Ms. Knese slept on the couch. Mr. Knese woke up early that morning and ingested some cocaine. About an hour after using cocaine, Mr. Knese went into the living room to talk about the couple's problems. Mr. Knese laid down by his wife, but Ms. Knese did not want to talk. Ms. Knese pushed him off the couch, but Mr. Knese continued touching her and talking to her. He forced himself back onto the couch and tried to engage in foreplay. When Ms. Knese protested, Mr. Knese pulled off her pants and panties. He forced himself on top of her and attempted to have sex with her; however they did not engage in intercourse because Mr. Knese could not sustain an erection.

Ms. Knese then, according to Mr. Knese, went "ballistic." The two began to fight, and Ms. Knese screamed, "rape." When she did this, Mr. Knese put one hand over her mouth while he squeezed her neck with the other. Ms. Knese grabbed a glass lampshade and swung. Mr. Knese blocked the swing with his arm, and the lampshade shattered. Ms. Knese picked up a piece of glass and swung again. This time she cut Mr. Knese's palm. Mr. Knese then took the glass and slashed her neck. The two fell to the floor, where Mr. Knese again began to strangle Ms. Knese. At one point, his hold was so tight that his thumb went through her skin. He also bit her neck. When she put a finger in his eye, he headbutted her. At the end of the altercation, Mr. Knese stood up, kicked her head and stood on her neck for five or ten minutes.

At trial, the State presented physical evidence that corroborated Knese's confession. A forensic pathologist performed an autopsy on Ms. Knese and listed the cause of death as manual strangulation and probable suffocation, combining to cause asphyxiation. She found multiple abrasions, large amounts of hemorrhage, bruising, lacerations and cuts about Ms. Knese's head and neck area. The medical examiner also gave her opinion that sexual assault was probable, based on the fact that the body was in a prone position with legs spread and was partially nude, and the fact that Ms. Knese had been killed with the assailant very close to her body.

Following trial, the jury convicted Mr. Knese of attempted rape, sentencing him to twenty years imprisonment on that charge, and of first degree murder. For that crime, the jury recommended the death penalty.

## I. Admissibility of Accused's Statements to Police

Prior to trial, Mr. Knese filed a one page motion to suppress which moved, in its entirety, "to suppress any and all statements obtained from the defendant of whatever kind or nature on the grounds that such statements were obtained in violation of defendants rights against self-incrimination as numerated in the Fifth–Amendment to the Constitution of the United States." Following a hearing, this motion was summarily overruled, and several of Mr. Knese's statements given while he was being treated in the hospital emergency room, which amounted to a detailed confession to the murder and attempted rape of his wife, were presented to the jury. Mr. Knese contends that the trial court erred in overruling his motion to suppress, arguing that his waiver of his right against self-incrimination was not voluntary, knowing and intelligent.

At the suppression hearing the State presented the evidence of four police officers. The first officer to speak with Mr. Knese was an evidence technician, Officer Chestnut, who collected Mr. Knese's clothes and photographed his injuries. Officer Chestnut first saw Mr. Knese at approximately 7:30 a.m. and was in his presence on and off for two hours. He did not ask Mr. Knese any questions, although Mr. Knese made several statements spontaneously that were not introduced at trial. He testified that when he initially saw Mr. Knese he was acting "abnormal" and that he was acting "wild": "He had a wide open look in his eyes, far away stare. His eyes were rolling back and forth very rapidly, staring at the ceiling. He was lying flat on his back. His body was acting like he was pacing." Although initially he was "fading in and out of reality," later Mr. Knese "calmed down and he seemed like he was more understanding of what was going on and understanding of what had transpired." A second officer, Sergeant Schwendemann, spoke with Mr. Knese immediately before Officer Chestnut, and described him as "calm and rational" at that time. The statements made by Mr. Knese to Sergeant Schwendemann also were not presented at trial.

Detective Harvey, who did testify at trial, began to interrogate Mr. Knese at approximately 8 a.m. He testified that, at that time, Mr. Knese appeared "very coherent and understood what [Detective Harvey] was talking about." Detective Harvey advised him of his *Miranda* rights,[3] and Mr. Knese indicated that he understood each of the rights. Mr. Knese then made a detailed statement describing the altercation with his wife in which he admitted choking her into unconsciousness. Detective Harvey returned at 2:20 that afternoon to have Mr. Knese repeat his confession on audio tape. Before he began the interrogation, Detective Harvey gave Mr. Knese a form advising him of his Miranda rights, read it to him as Mr. Knese read along and, after Mr. Knese had agreed, on audio tape, that he understood the rights he was waiving, had Mr. Knese sign the waiver. Mr. Knese then gave a detailed forty minute interview where he described the altercation where he killed his wife. At that time, Detective Harvey testified, Mr. Knese appeared lucid and coherent. Detective Harvey again returned to Mr. Knese's bedside at 5:20 the same afternoon. After again advising Mr. Knese of his *Miranda* rights, Detective Harvey asked Mr. Knese if

3. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

he had had intercourse with his wife prior to killing her. Mr. Knese indicated that he had attempted to, but was unable to maintain an erection.

Detective Morrissey also testified at the suppression hearing and at the trial. He testified that Mr. Knese approached him at 9:50 that morning, after he had been Mirandized by Detective Harvey, and described the incident to him in some detail. Detective Morrissey testified that during this statement and the statements made to Detective Harvey, Mr. Knese was coherent.

■■■ In order for a waiver of *Miranda* rights to be operative, the waiver must, under the facts and circumstances in each particular case, be voluntary, knowing and intelligent.[4] Although he did not present specific grounds in his suppression motion, Mr. Knese claimed during the hearing on that motion, at trial, and in his motion for new trial that his mental condition rendered his confession unintelligent. It is not clear what Mr. Knese suggests caused this deficient mental condition. Mr. Knese presented no evidence at the suppression hearing. No evidence was produced at any time, and indeed Mr. Knese does not claim now, that any of the injuries he suffered or treatment he received were of the kind that would cause him not to understand the rights he was waiving. In fact, defense counsel, after asking for an extra week to review Mr. Knese's hospital records, reported to the trial court that although the records did contain "rather significant indications ... that he was in [sic] highly agitated state," he did not "think their [sic] is enough in the records to justify submitting them as part of the motion to suppress the confession." The fact that Mr. Knese may have used cocaine earlier in the day or that Officer Chestnut observed that he was "fading in and out of reality" some time before waiving his rights are not sufficient to render his

waiver unintelligent: "a deficient mental condition, whether manifested by delusional behavior or a positive drug test, does not by itself render a statement unintelligent. A defendant does not have the constitutional right 'to confess to his crime only when totally rational and properly motivated.'"[5] Given that Mr. Knese repeatedly waived his *Miranda* rights over a period of many hours and gave detailed, coherent statements over that time, the trial court did not err in overruling defendant's motion to suppress the confessions as being the product of an unintelligent waiver.

■■■ Mr. Knese also claims, for the first time on appeal, that the confession was inadmissible since the waiver was unknowing and involuntary. These issues are not preserved for review. "To preserve an objection to evidence for review, the objection must be specific, and the point raised on appeal must be based upon the same theory."[6] There was no plain error in not finding the waiver involuntary or unknowing. As to knowledge of the rights waived, Mr. Knese stipulated at the suppression hearing that the officers who questioned him properly advised him of the substance of his *Miranda* rights. As to voluntariness, Mr. Knese analogizes this case to *Mincey v. Arizona,*[7] where the United States Supreme Court held a confession involuntary because police officers had interrogated a suspect while he was being treated for a gunshot wound. While *Mincey* is distinguishable because the defendant's injuries in that case were much more serious that Mr. Knese's (Mr. Mincey was nearly in a coma),[8] the primary difference between the two cases is that, in *Mincey,* the defendant was repeatedly interrogated, despite his grave physical condition and his repeated insistence that he did not want to answer questions.[9] Here, unlike in *Mincey,* Mr. Knese never expressed any desire to remain silent or to have an attorney present. Indeed, on sever-

---

4. *Edwards v. Arizona,* 451 U.S. 477, 482–83, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

5. *State v. Bucklew,* 973 S.W.2d 83, 90 (Mo. banc 1998) (quoting *State v. Smith,* 944 S.W.2d 901, 911 (Mo. banc 1997)).

6. *State v. Driver,* 912 S.W.2d 52, 54 (Mo. banc 1995).

7. 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

8. *Id.* at 398, 98 S.Ct. 2408.

9. *Id.* at 396–403, 98 S.Ct. 2408.

al occasions Mr. Knese spontaneously made incriminating statements to police officers who never questioned him at all. Despite the fact that he was in the hospital at the time, there is not the slightest evidence in the record that Mr. Knese's numerous statements were anything less than voluntary, and the trial court did not plainly err in failing to exclude the confession on this basis.

 Mr. Knese also argues that the trial court erred in failing to specifically make a factual finding on the record that his waiver was knowing, intelligent and voluntary and requests that the court remand for such findings. This Court has repeatedly emphasized the requirement that the record be clear that the trial court did make such findings, especially with regard to voluntariness.[10] It is equally clear that this is not a formal requirement, and it is not necessary that the specific words "knowing and intelligent" must be used in the trial court's ruling.[11] While the Court has remanded for findings on the issue of whether a confession is knowing and intelligent, this has only been where, as in *Bittick*, the trial court's ruling was ambiguous on this issue. In that case, the trial court had expressed "some confusion" about the state of the law in its oral findings and appeared to suggest that a finding of voluntariness was, by itself, sufficient to allow the confession.[12] Here the sole issue presented to the court at the suppression hearing was whether the confession was intelligent. Given that, and the overwhelming testimony presented at that hearing that Mr. Knese intelligently waived his rights, we find the court's one sentence ruling to be a clear indication that the court found Mr. Knese's waiver intelligent.

 The issue of voluntariness merits some discussion, since this Court has often emphasized that "once the defendant objects to a confession's admission, there must be, prior to its admission into evidence, a clear-

cut determination that the confession was in fact voluntary," and that conclusion must "appear from the record with unmistakable clarity."[13] We continue to adhere to this principle, but note that, in order to implicate this rule, the defendant must object to the voluntariness of the confession. Where, as here, there was no claim made to the trial court or evidence presented that a confession was involuntary, requiring the trial court to make such findings would amount to no more than an exercise in empty formalism. Given that the sole objection interposed to the admission of the confession was that the waiver was unintelligently made, it was not error for the trial court to fail to specify with more particularity its reasons for overruling defendant's motion to suppress.

## II. Admissibility of Crime Scene and Autopsy Photos

 Mr. Knese next argues that the trial court erred in admitting graphic videotape footage and photos of the crime scene, in admitting autopsy photos, and in allowing various witnesses to refer to these exhibits while testifying. During the testimony of one police officer, the State introduced a videotape of the crime scene and played a portion of the tape for the jury that depicted the living room where the killing took place. The videotape showed Ms. Knese's nearly naked body and close-ups of her wounds and bloody and bruised face and neck. Mr. Knese objected that the videotape was unduly prejudicial due to its gruesome nature. During the testimony of a second officer, the State introduced eleven photos of the crime scene, including a number depicting Ms. Knese's body, and close-up photographs of her injuries. One of these photographs was later referred to during the later testimony of a crime scene technician to demonstrate where a piece of clothing he recovered was

---

10. *See e.g., State v. Bucklew*, 973 S.W.2d 83, 90 (Mo. banc 1998); *State v. Schnick*, 819 S.W.2d 330, 336; *State v. Bittick*, 806 S.W.2d 652 (Mo. banc 1991); *State v. Lytle*, 715 S.W.2d 910 (Mo. banc 1986). *See also Sims v. Georgia*, 385 U.S. 538, 87 S.Ct. 639, 17 L.Ed.2d 593 (1967); *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

11. *Bucklew*, 973 S.W.2d at 90; *State v. Mease*, 842 S.W.2d 98, 105 (Mo. banc 1992); *Schnick*, 819 S.W.2d at 336.

12. *Bittick*, 806 S.W.2d at 654.

13. *Lytle*, 715 S.W.2d at 915.

found. During their guilt phase closing, the State referred to the photos and the videotape to argue that the condition and position of Ms. Knese's body indicated that she was not killed in self-defense. In the penalty phase closing, the State referred to one of the crime scene photographs in arguing that the killing was unreasonably brutal.

The autopsy photos introduced during the testimony of the medical examiner show various injuries on Ms. Knese's body, on her hands and arms, inside her mouth and on her head. Some of these injuries are visible in the crime scene photos and videotape, while many are not. The medical examiner used these photographs to explain her autopsy findings.

▮▮▮ As Mr. Knese recognizes, it is within the trial court's discretion to decide whether potentially inflammatory evidence should be admitted.[14] Even gruesome or graphic depictions are admissible if they demonstrate the nature and location of wounds, show the location and condition of the body, or prove an element of the state's case.[15] In this case, the condition of the crime scene, of Ms. Knese's body, and the severity and nature of her injuries were highly relevant to the key issues in the case: whether a sexual assault had occurred, whether the killing was in self-defense and whether it was a product of deliberation.

▮▮▮ Thus, these exhibits were admissible and Mr. Knese's objection is not primarily to the relevance of the matter presented, but rather to the repeated presentation of this material to the jury. While we agree with Mr. Knese that graphic depictions of this sort carry a danger of prejudice, the exact line where particular matter, although relevant, crosses the line into being more prejudicial than probative is necessarily a judgment we entrust to the trial court. Here, the trial court was sensitive to these concerns, excluding several photographs of Ms. Knese it deemed duplicative, and sustaining the defense's objec-

tion to allowing the jury to view Ms. Knese's body on the videotape a second time. While graphic, the exhibits in question were highly relevant to contested issues in the case, and the trial court acted well within its discretion in concluding that the particular material presented was more probative than prejudicial.

## III. Expert Qualification of the Medical Examiner

Dr. Case, the chief medical examiner for St. Charles County, performed the autopsy on Ms. Knese and was called by the State in Mr. Knese's trial. Mr. Knese argues that Dr. Case was erroneously allowed to give opinions on two matters.

▮▮▮ In her autopsy report, Dr. Case found that Ms. Knese was the victim of a probable sexual assault. Dr. Case testified that she based this finding on several factors, including the fact that Ms. Knese was strangled by an assailant at close range, the condition of her clothes, and the position of her body. Mr. Knese objected to Dr. Case's testimony regarding that opinion on the ground that this was not a medical conclusion and that Dr. Case was not, therefore, qualified to render an opinion on this point. "Because expert testimony is always fraught with questions of relevancy and competency, the decision to admit expert conclusions is a matter of trial court discretion that will not be overturned on appeal absent an abuse of discretion."[16] While Mr. Knese's point might have some merit if Dr. Case was solely qualified as a general medical expert, this argument ignores the fact that Mr. Knese stipulated that Dr. Case was an expert in forensic pathology. As Dr. Case described, forensic pathology is a subspecialty of pathology dealing specifically with the work of medical examiners, in particular determining the cause of death (the immediate physical condition that precipitated death) and the manner of death (the circumstances under which the death occurred). Given that the

14. *State v. Wood,* 596 S.W.2d 394, 403 (Mo. banc 1980).

15. *State v. Mease,* 842 S.W.2d 98, 108 (Mo. banc 1992).

16. *State v. Skillicorn,* 944 S.W.2d 877, 891 (Mo. banc 1997).

opinion that the death was probably related to a sexual assault is precisely within the area of expertise described by the witness, an area of expertise to which Mr. Knese conceded, the trial court did not abuse its discretion in allowing Dr. Case to describe her autopsy finding that Karin Knese appeared to have been killed incident to a sexual assault. Even if this testimony had been erroneously admitted, no prejudice would have occurred, since the testimony only suggested in conditional and probabilistic terms what Mr. Knese himself directly confirmed: that he was attempting to sexually assault Ms. Knese at the time of the killing.

 Mr. Knese also contends that Dr. Case should not have been allowed to testify as to the stimulant effects cocaine generally causes in its users. This point was not preserved in the motion for new trial and, therefore, reviewed for plain error only. While it is difficult to determine precisely what relevance this general testimony had to the specific case at hand, it is also difficult to determine how Mr. Knese's defense might have been prejudiced by Dr. Case's opinion that cocaine use may cause increased strength and stamina in its users. Mr. Knese does not explain how he was prejudiced, and there is no suggestion in the record of any prejudice that would rise to the level of manifest injustice.

## IV. Sufficiency of Evidence of Deliberation

 Mr. Knese next argues that there was insufficient evidence of deliberation to support his conviction for first degree murder. Deliberation is defined as "cool reflection for any length of time no matter how brief."[17] It is not necessary that the actor brood over his or her actions for a long period of time.[18] Rather, it is necessary "only that the killer had ample opportunity to

terminate the attack once it began."[19] In evaluating the sufficiency of the evidence, this Court reviews all evidence and inferences drawn therefrom in the light most favorable to the verdict, and disregards all contrary inferences.[20]

 Viewed in this light, Mr. Knese had ample opportunity to reconsider his course of behavior toward his wife and to terminate the beating short of killing her. Mr. Knese told Detective Morrissey that after he had been strangling Ms. Knese for such a long time that he was exhausted and could tell that Ms. Knese was losing her strength because he could barely feel her pulse, he nevertheless got to his feet, kicked her several times and then stood on her neck until she stopped moving. This Court has previously found premeditation to exist when a defendant strangled the victim with his bare hands, and then applied a towel to the victim's face for several minutes longer to make sure the victim was dead.[21] There was sufficient evidence, in particular Mr. Knese's own statements, from which a reasonable juror could have concluded that Mr. Knese deliberated on the killing of Ms. Knese.

## V. Guilt Phase Instruction on Range of Sentence for Attempted Rape

 Since Mr. Knese was not a prior, persistent or dangerous offender, he had a right to demand the jury sentence him for the attempted rape conviction.[22] The jury decided this sentence after returning its guilty verdicts in the first phase of the trial, but before hearing evidence in the death penalty phase. Mr. Knese claims that the trial court erred in failing to instruct the jury as to the range of punishment at the close of the guilt phase. Section 565.030 outlines the procedure for sentencing in cases involving a charge of first degree murder and prohibits

**17.** Section 565.002(3), RSMo 1994.

**18.** *State v. Feltrop*, 803 S.W.2d 1, 11 (Mo. banc 1991).

**19.** *State v. Johnston*, 957 S.W.2d 734, 747 (Mo. banc 1997).

**20.** *State v. Craig*, 642 S.W.2d 98, 101 (Mo. banc 1982).

**21.** *See State v. Sturdivan*, 497 S.W.2d 139, 142 (Mo.1973).

**22.** Section 557.036.2, RSMo 1994.

sentencing issues from being considered by the trier of fact during the guilt phase:

> Where murder in the first degree is submitted ... without a waiver of the death penalty, the trial shall proceed in two stages ... At the first stage the trier shall decide only whether the defendant is guilty or not guilty of any submitted offense. The issue of punishment shall not be submitted to the trier at the first stage.[23]

While the statute is not unambiguous as to precisely when a jury is to impose sentence for lesser crimes tried together with a capital charge, it is absolutely clear that a the jury is not to be instructed on this matter, as Mr. Knese argues, before it has returned its verdicts as to the guilt of the accused. The trial court did not err in omitting the range of punishment issue from the jury instructions at the close of the guilt phase.

## VI. Unpreserved Claims of Error

 In this appeal, Mr. Knese requests plain error review of numerous unpreserved claims of error.[24] Given the large number of plain error claims advance by Mr. Knese, we feel compelled to reiterate that "[t]he 'plain error' rule is to be used sparingly and may not be used to justify a review of every point that has not been otherwise preserved for appellate review."[25] Mr. Knese "must make a demonstration that manifest injustice or a miscarriage of justice will occur if the error is not corrected."[26]

### A. Penalty Phase Cross–Examination of Defendant

 Mr. Knese testified briefly at his penalty phase hearing, after which the State extensively cross-examined him, including asking him about prior bad acts, acts which included a past incident in which he allegedly choked his wife, his drug use, gambling, and incidents where he drove while intoxicated. Mr. Knese contends this line of questioning exceeded the scope of the direct examination and that the discussion of prior bad acts was impermissibly prejudicial. We examine for plain error only.[27]

 The subject matter of the State's cross-examination is generally limited to that which is broached in the examination in chief.[28] However, "cross-examination need not be confined to a categorical review of the matters stated in direct examination, but may cover any matter within the fair purview of the direct examination."[29] Furthermore, a counsel's failure to object to cross-examination that is outside the scope of direct examination opens the door for the particular line of questioning in the cross-examination.[30] "The scope of cross-examination ... is a matter primarily within the trial court's discretion, with the trial court's ruling not to be disturbed unless an abuse of discretion is

---

23. Section 565.030.2, RSMo 1994.

24. *See* Rules 29.12(b), 30.20.

25. *State v. Tokar*, 918 S.W.2d 753, 769 (Mo. banc 1996).

26. *Id.* at 769–70.

27. Mr. Knese contends that the alleged error with regard to examination on the topic of the prior choking incident is preserved, based upon the following colloquy:

> Q: Now, you said that you had rough times with your marriage with Karen; you just that a few minutes ago?
> A: Yes, there have been rough times.
> [Defense Counsel]: Your Honor, may we approach the bench for just a moment?
> THE COURT: You may.
> [Defense Counsel]: I hope you are not going to get—
> THE COURT: We're not going—
> [Prosecutor]: He opened the door.

> [Defense Counsel]: You opened—
> THE COURT: Objection overruled.

Defense counsel interposed no further objections during extensive questioning related to this alleged incident. Mr. Knese objects to these later questions on hearsay grounds, because they relate to prior bad acts and because they were outside the scope of direct examination. In order to preserve such an objection, the objection must be specific and the theory argued on appeal must be the same as that below. *State v. Driver*, 912 S.W.2d 52, 54 (Mo. banc 1995). Not only was there no specific objection here, Mr. Knese's counsel did not actually state an objection. This preserves nothing for review.

28. Section 546.260.1, RSMo 1994; *State v. Gorden*, 356 Mo. 1010, 204 S.W.2d 713, 715 (Mo. 1947).

29. *State v. Dill*, 282 S.W.2d 456, 463 (Mo.1955).

30. *Id.*

shown."[31] The trial court also has discretion during the penalty phase of trial to allow the introduction of any evidence that may assist the jury in determining the appropriate penalty, especially in cases involving the death penalty.[32] The subjects raised by the prosecution were relevant to Mr. Knese's character and, therefore, relevant to a juror's assessment of the proper penalty.[33] Because these questions related to questions of Mr. Knese's character properly at issue in the penalty phase of the hearing, the fact that much of this matter may have been outside the scope of the direct examination or related to prior bad acts of Mr. Knese was not so prejudicial as to rise to the level of manifest injustice. The trial court did not err in choosing not to *sua sponte* disallow these lines of questioning.

### B. Victim Impact Evidence

During the penalty phase of the trial, the prosecution called seven friends and family members of Ms. Knese to testify as what kind of person she was and to what effect her death had on their lives. The State also introduced numerous photographs of Ms. Knese and her family. Section 565.030.4 allows such evidence, within the discretion of the court. Although Mr. Knese did not object to any of this evidence at trial, he now seeks plain error review of the extent of this victim impact evidence.

As Mr. Knese concedes, evidence of victim characteristics and of the impact of a murder on survivors are constitutionally permissible types of evidence in a capital sentencing proceeding.[34] Mr. Knese argues, however, that *Payne* permits only a "brief glimpse" of the life of the victim and that the evidence presented here was much more than a brief glimpse of the life of Karin Knese. It is certainly true that one concurring opinion (of the three filed in that case) says that a State may allow the sentencing jury to see "a quick glimpse of the life [defendant] chose to extinguish."[35] But to suggest, as Mr. Knese does, that *Payne* stands for the proposition that only a brief glimpse of the victim's life is constitutionally permissible is to misread that case.

The fundamental rationale announced by the Court in *Payne* looks to the fairness of the sentencing phase proceedings. The majority opinion notes that, just as the defendant is entitled to present evidence in mitigation designed to show that the defendant is a "uniquely individual human being," the State should also be allowed to present evidence showing each victim's "uniqueness as an individual human being."[36] Specifically, "the State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family."[37] This evidence is necessary to allow the State to show the "full moral force" of its evidence and to prevent the victim from becoming "a faceless stranger at the penalty phase of a capital trial."[38] Thus, in the majority's view, there is "no reason to treat such evidence differently than other relevant evidence is treated."[39]

Justice O'Connor's concurring opinion agrees that the Eighth Amendment provides no cause for treating victim impact evidence differently from other types of relevant evidence.[40] Justice O'Connor also rec-

---

31. *Sprake v. Testerman*, 470 S.W.2d 526, 528 (Mo.1971).

32. *State v. Kreutzer*, 928 S.W.2d 854, 874 (Mo. 1996).

33. *See id.*

34. *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).

35. *Id.* at 830, 111 S.Ct. 2597 (O'Connor, J., concurring) (quoting *Mills v. Maryland*, 486 U.S.

367, 397, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) (Rehnquist, C.J., dissenting)).

36. *Id.* 822–23, 111 S.Ct. 2597.

37. *Id.* at 825, 111 S.Ct. 2597.

38. *Id.*

39. *Id.* at 827, 111 S.Ct. 2597.

40. *Id.* at 831, 111 S.Ct. 2597 (O'Connor, J., concurring).

ognizes that this type of evidence has the potential to be unduly inflammatory, a concern that we share. The issue, however, is not whether the victim impact evidence presented was more or less than a brief glimpse of the victim's life, but rather whether "in a particular case, a witness' testimony or a prosecutor's remark so infects the sentencing proceeding as to render it fundamentally unfair," and, therefore, a due process violation.[41]

Trial courts have both the power and the responsibility to ensure that this type of evidence does not infringe on a defendant's right to due process in sentencing. Under section 565.030.4, the trial court has discretion to exclude victim impact evidence altogether. Additionally, such evidence must be presented consistent with the normal rules of evidence,[42] meaning that traditional evidentiary rules, including those related to cumulative evidence and to the weighing of probative value against prejudicial impact, apply with equal force in a capital sentencing proceeding. Of course, for these evidentiary rules to aid the defendant in limiting the extent of victim impact evidence and ensuring a fair trial, the defendant must bring any alleged violations of these rules to the attention of the trial court in a timely fashion.

 Here, Mr. Knese failed to object to any of the victim impact evidence, and we are not, therefore, presented with the question of whether all of the evidence presented would have been admissible had proper objection been made. No manifest injustice occurred in allowing the jury to hear the type or extent of victim impact evidence presented in this case.

### C. Improper Argument

Mr. Knese submits twelve remarks made by the prosecutor during the arguments of the guilt and penalty phases of the trial that, although they are not preserved in his motion for a new trial, he claims were improper and have resulted in manifest injustice. As this Court has previously held: "it is well settled that '[r]elief should be rarely granted on assertion of plain error to matters contained in closing argument, for trial strategy looms as an important consideration and such assertions are generally denied without explanation.' "[43]

### 1. Guilt Phase

 When describing how Mr. Knese cut his wife thirty times with a piece of glass, the prosecutor suggested that Mrs. Knese "each time he cut her, each of those thirty times, she must have cried out in excruciating pain." He also argued that "[e]ach of those cries was a plea for mercy. Each of those cries was a plea for another moment of life." Mr. Knese argues that these statements are arguments of facts outside the evidence and are designed to improperly inflame the passions of the jury. Generally, a prosecutor may argue conclusions reasonably derived from the evidence, as long as the prosecutor does not suggest that he or she has some secret knowledge not presented to the jury.[44] These comments seem to be directed at dramatizing for the jury the numerous opportunities Mr. Knese had to stop his attack, emphasizing the State's position on the primary disputed issue in the case, that Mr. Knese deliberated before killing Ms. Knese. In any case, these comments are neither so far outside the evidence nor so inflammatory as to constitute a manifest injustice sufficient to warrant plain error relief.

 Mr. Knese next argues that the court plainly erred by allowing the prosecutor to have the jury sit in silence for five minutes during his argument to demonstrate how long Mr. Knese stood on Ms. Knese's neck. Mr. Knese claims that this was improper personalization and designed to anger and inflame the jury. Contrary to Mr. Knese's claim, the argument did not invite the jurors to put themselves in Mrs. Knese's place, but rather to show how long Mr. Kne-

**41.** Id.

**42.** Section 565.030.4, RSMo 1994.

**43.** State v. Cobb, 875 S.W.2d 533, 537 (Mo. banc 1994).

**44.** State v. Debler, 856 S.W.2d 641, 651 (Mo. banc 1993).

se had to consider what he was doing as he was killing his wife. The trial court did not plainly err in allowing this argument.

■ Mr. Knese contends that the court plainly erred in allowing the prosecutor to encourage the jury to disregard the court's instructions by arguing that the jury could only consider second degree murder once it had unanimously acquitted Mr. Knese of first degree murder. This statement appears to be an accurate characterization of the court's instruction, however, and does not, in any case, rise to the level of manifest injustice sufficient to warrant plain error relief. Similarly, the prosecutor's comment that a verdict of manslaughter would be "the most tragic verdict" since it would require a finding that Karin Knese provoked her own death is not an exhortation to disregard the judge's instructions sufficient to warrant plain error relief. Arguing that a particular finding necessary to reach a verdict would be unjust is not the same thing as urging the jury to disregard the court's instructions. Indeed, it is an argument to take the instructions seriously and not to return a lesser verdict unless the evidence actually supports each element required to return that verdict.

■ Mr. Knese argues that the prosecutor engaged in excessive biblical reference during his argument. In arguing that Ms. Knese did not provoke Mr. Knese to kill her, the prosecutor said "God help us all if that action (attempting to rape Ms. Knese while high on cocaine, while their baby slept in the next room) ever comes to be viewed as justification for taking a life." The prosecutor said "what I ask you to do, what I pray that you will do, and what I know you will do is" return a first degree murder verdict. The prosecutor twice said "God bless her" when referring to the ferocity of the defense Ms. Knese put up against Mr. Knese's attack. In the course of remarking upon how much damage Mr. Knese had to inflict upon Ms. Knese in order to kill her, the prosecutor said that "[i]t is almost as if the good Lord wants to make it difficult for someone to take another person's life in this brutal way." Viewed in context, these references are, at

most, ambiguous, general references to religious matters, and certainly do not rise to the level of "excessive biblical or historical references" criticized by this Court in *State v. Debler*.[45] In that case both the prosecution and defense offered competing biblical and historical analogies for the factual situation presented there, and this Court admonished both sides that such argument was, at best, unhelpful, since it tended to divert the focus of the argument away from matters actually at issue in the trial.[46] In this case, the argument was clearly directed to the facts of the case, and despite the occasional use of the word "God," the prosecution's argument was not designed to appeal to any improper bias on the part of the jurors. The trial court did not plainly err in allowing this argument.

■ Mr. Knese also argues that the trial court plainly erred in allowing the State to argue that, although no semen was recovered from the crime scene, there might nevertheless have been semen present. Although Mr. Knese claims that this argument was outside the evidence, in fact, given that Mr. Knese confessed to attempting to have intercourse with the victim and that semen was found on his underpants, the inference argued by the State was a permissible one. The trial court did not plainly err in allowing this argument.

■ Next Mr. Knese argues that "[t]hroughout the guilt phase argument, the prosecutor trashed Mr. Knese, emphasizing his drug use, evidence of other crimes." Allowing the State to refer to the evidence that Mr. Knese had taken cocaine before he killed his wife was not plain error. This was evidence before the jury and was arguably relevant to the question of whether, as Mr. Knese contended, he killed his wife in self-defense, that is, a reasonable belief that he was in imminent danger from his wife.

■ Finally Mr. Knese argues that the trial court plainly erred in failing to stop the State from opening and closing its argument with references to Ms. Knese's young son, where the prosecutor noted that Ms. Knese

---

**45.** 856 S.W.2d 641, 656 (Mo. banc 1993). **46.** *Id.*

would not get to see her son take his first steps and that Mr. Knese had deprived her son of his mother. Mr. Knese is correct that, in the guilt phase of the trial, such argument is irrelevant and appears designed to appeal to the jury's emotional sympathy for Ms. Knese's son. But Mr. Knese did not object to this argument. And Mr. Knese has not met his burden of showing that these two references, laid alongside the remainder of the prosecutor's argument, which focused on the extended brutality of the killing, as described by Mr. Knese himself, had a "decisive effect" on the jury's verdict.[47]

### 2. Penalty Phase

■ In the penalty phase opening statement, the prosecutor told the jury that if it found aggravating circumstances, it would then consider mitigation and that "if twelve of you agree that there is mitigating circumstances, you don't have to agree on the same one, then you weigh the mitigating circumstances." Mr. Knese argues this statement misstates the law by informing jurors that they must be unanimous in order to consider mitigating evidence, in violation of *Mills v. Maryland*,[48] and *McKoy v. North Carolina.*[49] In point of fact, the prosecutor's statement exactly reflects the instruction given in this case, which requires the jury to impose a life sentence if they unanimously agree that mitigating evidence, as determined by each individual juror, outweighs the aggravating evidence. What *Mills* and *McKoy* prohibit is the requirement that all jurors find a mitigating circumstance unanimously before any of them can consider it in weighing aggravating and mitigating circumstances.[50] The prosecutor's statement here reasonably describes the law as given in the court's instruction and does not amount to plain error.

■ During the penalty phase argument, the State referred to defendant's cocaine use and argued that the jury should not consider that as a mitigating factor, and that, in the State's view, the cocaine use was an aggrava-

ting factor. Mr. Knese objects to these statements because, he claims, "drug use and addiction is mitigating," and that the prosecutor's argument "violated Mr. Knese's rights to have jurors consider mitigation." Mr. Knese is certainly right that drug intoxication use may be considered a mitigating factor especially where, as here, one statutory mitigating circumstance submitted was that the murder took place while Mr. Knese was under the influence of extreme mental or emotional disturbance. Mr. Knese, however, cites no authority for the proposition that the use of illegal drugs may, as a matter of law, only be considered in mitigation. Given that a penalty phase jury is bound to consider the character of the defendant, including whether the defendant has a significant history of prior criminal activity, it cannot be said that it was plainly erroneous for the court to allow the prosecutor to argue that cocaine use should be considered an aggravating, rather than a mitigating, circumstance.

■ Mr. Knese argues that the State's argument "mocked Mr. Knese and our criminal justice system" by stating that "[w]e have enshrined [Mr. Knese] in a panoply of protection of rights, and we have proved this case and all of these elements beyond a reasonable doubt." Mr. Knese apparently believes this remark is an invitation to penalize Mr. Knese for exercising his constitutional rights. It is unclear how Mr. Knese thinks these remarks mock the criminal justice system or invite the jury to do anything improper. We conclude the remarks do not amount to a plain error sufficient to produce a manifest injustice.

■ Mr. Knese contends that the prosecution impermissibly disparaged the defense by suggesting that his argument that he should not be executed because he was high on cocaine was akin to the Menendez brothers arguing that they should be treated leniently because they were orphans. While we would prefer that a prosecutor refrain

---

47. *State v. Parker*, 856 S.W.2d 331, 333 (Mo. banc 1993).

48. 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988).

49. 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990).

50. *McKoy*, 494 U.S. at 439–44, 110 S.Ct. 1227.

from comparing defendants to other famous murder defendants, the basic point of this argument is that jurors should not consider as a mitigating factor something that the defendant was responsible for. This is a fair point. While it is improper, as Mr. Knese points out, to personally accuse defense counsel of improper conduct,[51] Mr. Knese seems to further suggest that it is improper for the prosecutor to criticize the defense's theory of the case. A primary purpose of the State's argument in a criminal case is precisely to attempt to discredit the defendant's theory of the case. No plain error occurred.

■ Finally Mr. Knese argues that the prosecutor's argument that the jury should sentence Mr. Knese to death in order to "send a message" to others who would consider such a crime was plainly erroneous. As we have noted before, and as Mr. Knese concedes, arguments of this sort do not constitute plain error.[52]

None of the allegedly improper argument by the State was sufficiently prejudicial to warrant plain error relief.

### D. Defense's Peremptory Strikes of Female Jurors

■ Mr. Knese asserts that his counsel used his peremptory strikes to exclude women from the jury on the basis of their gender, and defense counsel disclosed during argument on the motion for new trial that this had been his strategy. As a general matter, peremptory strikes may not be used to remove venirepersons based on their gender.[53] Even a criminal defendant may not exercise his or her peremptory challenges in a discriminatory manner.[54] Mr. Knese contends that he is entitled to a new trial be-

cause his attorney used his peremptory challenges in a discriminatory fashion.

■ Mr. Knese has no standing to raise this claim. As this Court has held, a criminal defendant may not seek relief from a judgment based upon an error that was committed at his instance.[55] While Mr. Knese claims that his own equal protection rights were violated by this practice, he does not support this claim, and it is unclear how, even theoretically, a defendant can violate his own equal protection rights. Somewhat more plausible is the claim that Mr. Knese has violated the equal protection rights of the women excluded from the jury on the basis of their gender.[56] While Mr. Knese's actions may amount to a violation of the equal protection rights of the excluded venirepersons, he does not have standing to raise that violation to challenge his conviction. In order to raise such third-party standing, a litigant must "demonstrate that he has suffered a concrete injury, that he has a close relation to the third party, and that there exists some hindrance to the third party's ability to protect its own interests."[57] Thus, the State has standing to object to the equal protection violation inherent in a criminal defendant's use of discriminatory peremptory strikes.[58]

In contrast, Mr. Knese cannot claim to have suffered a concrete injury by his own exercise of peremptory strikes. The sole case Mr. Knese cites where a criminal defendant has been given a new trial due to his own discriminatory exercise of peremptory strikes is *United States v. Huey.*[59] In that case, two defendants, Mr. Garcia and Mr. Huey, were tried jointly and both the State and Mr. Garcia objected when Mr. Huey used all of his peremptory challenges to

**51.** *State v. Hornbeck*, 702 S.W.2d 90, 92–93 (Mo. App.1985); *State v. Harris*, 662 S.W.2d 276, 277 (Mo.App.1983).

**52.** *State v. Smith*, 944 S.W.2d 901, 919 (Mo. banc 1997).

**53.** *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).

**54.** *Georgia v. McCollum*, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992).

**55.** *State v. Leisure*, 796 S.W.2d 875, 878 (Mo. banc 1990); section 545.030.1(16), RSMo 1994.

**56.** *See McCollum*, 505 U.S. at 49–50, 112 S.Ct. 2348; *Powers v. Ohio*, 499 U.S. 400, 405–10, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991).

**57.** *McCollum*, 505 U.S. at 55, 112 S.Ct. 2348.

**58.** *Id.* at 55–56, 112 S.Ct. 2348.

**59.** 76 F.3d 638 (5th Cir.1996).

strike African–American jurors.[60] Despite the objections, Mr. Huey was not required to provide a race-neutral explanation for the strikes. In their joint appeal, the Fifth Circuit reversed both convictions, but explicitly found only that Mr. Garcia had standing to assert the equal protection violation of the venirepersons struck by Mr. Huey. We do not read *Huey* to hold that a criminal defendant has standing to complain of violations of venirepersons' equal protection rights he himself has caused. To the degree that that *Huey* stands for this principle, we are inclined to agree with the Seventh Circuit that *Huey* was wrongly decided.[61] Although "[i]mportant social interests allow a judge to block the defense from taking certain action ... [i]t does not follow that by violating these important social interests a defendant can help himself to a new trial."[62] Mr. Knese has no standing to challenge his conviction based on his own allegedly discriminatory conduct in the use of his peremptory strikes.

### E. Voir Dire on Range of Punishment

■ During voir dire, the trial court asked the venire whether any members of the panel could not follow the court's instructions as to the death penalty. Then, those who indicated that they might were questioned individually by the court and by the attorneys. After this, both sides were allowed to question the remaining venirepersons. Mr. Knese asserts that it was plain error for the trial court not to ask jurors whether they could impose a life sentence if instructed to by the court. Mr. Knese has cited no authority for the proposition that it is erroneous for the trial court to fail to ask, sua sponte, any particular questions during voir dire. Here Mr. Knese had an opportunity to ask any question he wished or ask the trial court to do so. In order to complain of insufficient voir dire, a defendant must attempt to have a specific question asked or, at a minimum, notify the trial court that he wishes to explore a particular area.[63]

The trial court did not plainly err in failing to ask this question sua sponte.

### F. Right to be Present at Proceedings

■ Mr. Knese contends that the trial court plainly erred in allowing his counsel to stipulate to the admission of three exhibits, which consisted of Mr. Knese's clothes and blood, without calling the officer who seized the items, Officer Chestnut. Mr. Knese claims that this stipulation was made without his permission and violated his right to confront Officer Chestnut, who did not testify at trial. Mr. Knese argues that, if Officer Chestnut had been called, he would have repeated his testimony from the motion hearing that Mr. Knese was fading in and out of reality when he first saw him, and that such testimony would have been relevant to determining Mr. Knese's mental capacity to commit the offense here. We are unsure how the failure of counsel to object to the admission of physical evidence implicates defendant's right to confront a witness, and this point does not amount to plain error.

■ During voir dire, the following exchange occurred:

[Prosecutor]: Hold on. The defendant has left the courtroom.

The Court: I know that.

[Defense Counsel]: We have no problem. We waive his appearance for this.

It is unclear from the record for how long Mr. Knese was absent from the courtroom, and Mr. Knese alleges only that he was absent for "part of voir dire." A defendant can waive his right to be present at all critical stages of his or her trial by voluntarily and willfully leaving the courtroom.[64] The transcript indicates that Mr. Knese voluntarily left the courtroom, and it is presumed that such an absence is voluntary and willful unless evidence suggests otherwise.[65]

---

60. *Id.* at 640.

61. *United States v. Boyd*, 86 F.3d 719, 724–25 (7th Cir.1996).

62. *Id.* at 724.

63. *State v. Clark*, 981 S.W.2d 143, 146 (Mo. banc 1998).

64. *State v. Cheeks*, 604 S.W.2d 30,32 (Mo.App. 1980).

65. *Id.*

Mr. Knese neither claims nor shows that his absence was anything other than voluntary. Mr. Knese waived his right to be present at this stage, and no plain error occurred.

## G. *Mitigating Instruction on Defendant's Inability to Appreciate the Criminality of His Conduct*

Mr. Knese next argues that the trial court erred in not instructing the jury on the statutory mitigating factor of whether his capacity to appreciate the criminality of his conduct was substantially impaired.[66] Mr. Knese contends that evidence of his cocaine use at the time of the incident, his turbulent relationship with his wife and his "passionate reaction" to their argument all amount to the conclusion that the court should have included this mitigating factor in the jury instruction. Knese did not raise this point in his motion for new trial; we review for plain error only.

The instruction on mitigation submitted to the jury was:

### INSTRUCTION NO. 21

As to Count 1, if you unanimously find that the facts and circumstances in aggravation of punishment, taken as a whole, warrant the imposition of a sentence of death upon the defendant, you must then determine whether there are facts or circumstances in mitigation of punishment which are sufficient to outweigh the facts and circumstances in aggravation of punishment. In deciding this question, you may consider all of the evidence presented in both the guilt and punishment stages of trial.

As circumstances that may be in mitigation of punishment, you shall consider:

1. Whether the defendant has no significant history of prior criminal activity.

2. Whether the murder of Karin Knese was committed while the defendant was under the influence of extreme mental or emotional disturbance.

3. The age of the defendant at the time of the offense.

You shall also consider any other facts or circumstances which you find from the evidence in mitigation of punishment.

Mr. Knese relies on *Lockett v. Ohio* for the proposition that the Eighth and Fourteenth Amendments to the United States Constitution prohibit a sentencer from being precluded from considering relevant mitigating evidence as a basis for a sentence less than death.[67] The instruction at issue here, however, does not preclude the jury from considering the evidence to which Mr. Knese refers in determining whether to impose the penalty of death. To the contrary, the court instructed the jury to "consider any other facts or circumstances ... [found] from the evidence in mitigation of punishment." The only issue is, therefore, whether the facts warranted an instruction to the jury of the mitigating factor outlined in section 565.032.3(6).

 Mr. Knese first argues that evidence of his cocaine use warranted the instruction. The State points out that in this case, Knese did not offer any evidence, for example, psychiatric testimony, to demonstrate that his capacity to appreciate the criminality of his conduct was substantially impaired as a result of drug use. The only testimony that approached such a contention was the testimony that Mr. Knese had taken cocaine, his wild behavior after the murder and his claimed delusion of being chased by the devil. This Court has recently held that it was not erroneous for the trial court to refuse to offer this instruction even where there was evidence of intoxication and some amount of bizarre behavior after a murder.[68] Given the slight evidence presented here of Mr. Knese's alleged failure to comprehend the criminality of his conduct due to cocaine use, there was no manifest injustice in the failure to give the requested instruction, especially

---

66. Section 565.032.3(6), RSMo 1994.

67. 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

68. *State v. Johnston,* 957 S.W.2d 734, 752 (Mo. banc 1997).

since the "extreme mental disturbance" mitigating instruction was given.[69]

Mr. Knese also argues that his turbulent relationship with his wife, magnified by the argument the two had just prior to Ms. Knese's murder, further bolsters the conclusion that the trial court should have given the "substantially impaired" instruction. In support of this argument, Knese relies on *Cheshire v. State,* where the Supreme Court of Florida held that evidence that the defendant suffered from, among other things, "a perceived affront to his family status and the emotional distress that accompanies a failing marriage" commanded that the trial court give an instruction on mitigating factors.[70] However, *Cheshire* is distinguishable from the present case. *Cheshire* focused on the trial court's refusal to instruct the jury on Florida's analogue to Missouri's "extreme mental or emotional disturbance" mitigating factor, which as noted, was given to the jury.

The trial court's decision not to instruct the jury on the mitigating factor of whether "the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired" did not constitute plain error.

### H. *Depravity of Mind Aggravator*

██ Two aggravating circumstances were submitted to the jury at the close of the penalty phase, including the "depravity of mind" aggravator, that is:

Whether the murder of Karin Knese involved depravity of mind and whether, as a result thereof, the murder was outrageously and wantonly vile, horrible, and inhuman. You can make a determination of depravity of mind only if you find:

That the defendant committed repeated and excessive acts of physical abuse upon Karin Knese and the killing was therefore unreasonably brutal.[71]

Mr. Knese did not object to this instruction, but requests plain error review on the ground that the aggravating circumstance is unconstitutionally vague, and that there was no evidence to support its submission.

██ As we have previously held, this instruction is not unconstitutionally vague.[72] It is also supported by the evidence. In particular, Mr. Knese's statements and the physical evidence presented at trial were sufficient for the jury to conclude that Mr. Knese repeatedly attempted to strangle Ms. Knese and that he caused her death by standing on her neck, killing her in an unreasonably brutal fashion.

No error occurred in the submission of this instruction.

### I. *Rule 29.07 Proceedings*

Finally, Mr. Knese claims that the interrogation, conducted by the court after trial pursuant to Rule 29.07(b)(4), regarding the effectiveness of counsel, violates his rights to assistance of counsel, due process, and to remain silent. This claim is premature. This interrogation occurs after trial and sentencing have occurred and, thus, does not affect the propriety of the trial itself. Perhaps recognizing this, Mr. Knese does not raise the claim in his motion for new trial. Even in the arguably more appropriate context of a claim of ineffective assistance of trial counsel, this argument has been repeatedly rejected by this Court.[73]

### VI. Independent Statutory Review

Section 565.035.3 requires this Court to determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated

---

69. *See id.*

70. 568 So.2d 908, 911–12 (Fla.1990).

71. *See* section 565.032.2(7), RSMo 1994.

72. *State v. Butler,* 951 S.W.2d 600, 605–06 (Mo. banc 1997).

73. *State v. Roll,* 942 S.W.2d 370, 379 (Mo. banc 1997); *State v. Ervin,* 835 S.W.2d 905, 931 (Mo. banc 1992).

in subsection 2 of section 565.032 and any other circumstance found;

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both [sic] the crime, the strength of the evidence and the defendant.

After careful review of the record and transcript, this Court finds that the sentence of death imposed for the murder of Karin Knese was not imposed under the influence of passion, prejudice, or any other arbitrary factor.

The trial court submitted and the jury found two aggravating circumstances. First the jury found that the murder evidenced a depravity of mind as described in section VI.H., *supra.* As noted in that section, the evidence supports that finding. The second aggravating circumstance found was that the murder occurred while Mr. Knese was attempting to rape Ms. Knese. The evidence, particularly defendant's own words, supports this finding. This Court finds that the evidence supports the trial court's finding of one statutory circumstance as required by section 565.030.4(1), and supports the other aggravating circumstance found.

Considering the crime, the strength of the evidence, and the defendant, this Court finds that the sentence is proportionate to other cases where the sentencer found beyond a reasonable doubt that the murder was committed while the offender was engaged in commission of a sexual assault, or that the murder evidenced a depravity of mind.[74] The sentence imposed was neither excessive nor disproportionate.[75]

The judgment of the trial court is affirmed.

All concur.

---

**74.** *See State v. Johnston,* 957 S.W.2d 734 (Mo. banc 1997); *State v. Richardson,* 923 S.W.2d 301 (Mo.banc 1996); *State v. Kinder,* 942 S.W.2d 313 (Mo. banc 1996); *State v. Sidebottom,* 753 S.W.2d 915 (Mo. banc 1988); *State v. Lingar,* 726 S.W.2d 728 (Mo. banc 1987).

**75.** Mr. Knese also raises the oft-rejected claim that this Court's proportionality review is unconstitutional. *See, e.g., State v. Parker,* 886 S.W.2d 908, 934 (Mo. banc 1994). We continue to adhere to this precedent.