**STATE of Missouri, Respondent,**

v.

**David T. ROLLER, Appellant.**

No. 23340.

Missouri Court of Appeals,
Southern District,
Division Two.

Sept. 22, 2000.

Motion for Rehearing and Transfer to Supreme Court Denied Oct. 19, 2000.

Application for Transfer Denied Dec. 5, 2000.

Nancy A. McKerrow, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Gregory L. Barnes, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Judge.

A jury found Appellant guilty of murder in the second degree, § 565.021,[1] and armed criminal action, § 571.015. The jury assessed punishment at twenty-five years' imprisonment for each crime. The trial court entered judgment per the verdicts, running the sentences consecutively.

Appellant brings this appeal from that judgment. He maintains the trial court erred in (1) ordering voir dire by the State to proceed in his absence, and (2) receiving in evidence six weapons that were "unrelated to the murder" for which he was tried.

Because Appellant does not claim the evidence was insufficient to support the verdicts, this opinion sets forth only the evidence germane to Appellant's claims of error.

On February 22, 1998, Appellant was residing with Catherine Stolp ("Victim") and her daughter, Julie, a high school senior.

Julie arrived home around 10:00 p.m. that date. Her nineteen-year-old sister, Jody, a college student who resided "on campus," and Jody's boyfriend, Tyler Thompson, were there. So was Appellant. Julie testified: "[A]s I went inside Jody ... told me that mom was gone and that [Appellant] had told mom that if she left never to come back, because they were in an argument about Tyler and Jody being there at the house."

Julie entered her bedroom and went to bed.

Jody, Tyler and Appellant left the residence around 10:30 in Tyler's car.

Julie was awakened several hours later. She recalled: "Mom ... came home and she was just hysterical, wanting to know where [Appellant] was ... my bedroom door was shut and she came in and threw it open and just like, 'Well, where's he at?' And I went like, 'I don't know.'"

After that exchange, Julie tried to go back to sleep.

Sometime later, Jody, Tyler and Appellant returned to the residence. Jody estimated it was around 3:30 a.m.

Appellant, alone, entered the residence. Jody and Tyler departed.

Julie heard Appellant and Victim arguing. Julie recounted, "[T]hey were just both yelling back and forth." During the argument, Julie heard a gunshot. She then heard Appellant say, "How's that for scaring you." She heard no voices thereafter.

A minute or two passed. Then, Julie heard another gunshot.

She arose, left her bedroom, and "peeked around the corner" to see "what was going on." She saw Appellant "on the phone to 911." Asked what she heard Appellant say, Julie responded, "They needed an ambulance over there." Julie also heard Appellant say "[h]is girlfriend or wife or somebody had been shot."

A "911 call taker" received Appellant's call at 3:50 or 3:51 a.m. In the call—recorded on tape—Appellant said, "I was trying to scare my wife by shooting over her head and I think I just pulled down a little bit low."

Appellant hung up while the "call taker" was contacting the fire department and police department. However, he called back. This time, he said, "She grabbed

1. References to statutes are to RSMo 1994.

the gun and it just sort of went off, I was just threatening her."

Meanwhile, Julie had retreated to her bedroom and telephoned her pastor's wife. Julie explained, "I really didn't know what had happened and I was hysterical and needed to calm down." Julie feared Victim had been shot.

After talking briefly with the pastor's wife, Julie exited her bedroom because she "wanted to see mom."

Julie saw Appellant standing by the kitchen table. She asked him where Victim was. He gave her a "blank stare."

Julie entered the living room and saw Victim in a chair, "leaning back with her eyes shut, with a bullet [hole] in her neck." Julie "saw the blood."

Julie never saw Appellant try to help Victim.

Officer Bridgeforth was dispatched to Appellant's residence about 3:53 a.m. and arrived "within a minute or shortly after that." Officer King arrived simultaneously with Bridgeforth. They saw no sign of forced entry.

Julie met the officers at the door. They entered and found Victim in a chair. Bridgeforth saw blood "oozing out of" Victim's neck wound.

Appellant was seated in a chair, smoking a cigarette, six to eight feet from Victim.

Bridgeforth checked Victim's pulse and "found a very weak, slow pulse."

Bridgeforth handcuffed Appellant and "handed him off to another officer who had come in."

About that time, paramedics arrived and took Victim to a hospital.

Bridgeforth found a Lorcin .380 caliber semi-automatic pistol on the floor by the chair where Appellant had been seated. There were bullets in the magazine and one in the firing chamber.

Officer Novakovich escorted Appellant from the residence to Novakovich's patrol car. As Novakovich opened the door, Appellant said, "It was no excuse, she scratched my forehead." En route to jail, Appellant told Novakovich he had "shot three times, the first two didn't hit her, and it was an accident." The gunshot injured Victim's spinal cord, rendering her a quadriplegic. She also sustained brain damage "from not getting oxygen to her brain." She never regained sufficient consciousness to communicate, and died in the hospital March 13, 1998. Death resulted from pneumonia, "a normal complication and result of the gunshot wound."

Tyler Thompson talked to Appellant while Appellant was in jail.[2] Asked at trial whether Appellant said anything about the shooting, Tyler responded: "I never got a straight answer . . . he really did not confide in me. . . . [H]e didn't know, he was asleep in his chair."

Jody talked to Appellant sometime after the shooting; the date and place of the conversation are unrevealed by the record. Jody's testimony:

"Q. Did you ask him what had happened the night of the shooting?

A. Yes.

Q. And what explanation did he give you?

A. He said that when he got home my mom was going to shoot herself, and that he convinced her to lay the gun on the coffee table between their two chairs, and the gun just went off."

Julie testified without objection that Appellant owned guns. She added, "I was told that at the house they found seven." Julie was aware Appellant kept a "real small gun" in a black bag that he carried with him. She recalled hearing him firing guns in "the basement of the house."

Jody testified without objection that Appellant had "a lot" of guns in the house. She, like Julie, recalled he carried one in a

2. The record shows Appellant was released on   bond July 6, 1998.

black bag. Jody confirmed Julie's testimony that Appellant practiced shooting "in the basement." A wall there had "a bunch of holes in it."

Officer Rader searched the residence of Appellant and Victim on the afternoon of February 23, 1998, pursuant to a search warrant. Rader testified without objection that in addition to the Lorcin .380 caliber pistol (found by Bridgeforth on the floor by the chair where Appellant was seated), he—Rader—found four to five other guns. Some were "underneath the bed in the bedroom in the lower part of the house," and some were on shelves along the bedroom wall.

The transcript shows that prior to voir dire, the trial court heard argument on "some defense motions in limine."[3] The remarks of Appellant's lawyer ("Defense Counsel")[4] included this:

"Number five, there were a lot of guns, pistols and rifles in the basement. We don't see how this is relevant, particularly in view of the fact that a lot of their testimony is going to be that these were owned by the deceased. But I think the inference will be that these guns or pistols were owned or possessed by the defendant. We believe that that's irrelevant and immaterial."

The prosecutor responded:

"This element goes to the question of knowing, which is one of the elements that we have to prove. Mr. Roller has indicated on the 911 tape that it was an accident. He mentions fired over her head and the gun kind of rolled down and he shot her inadvertently. And we want to show the jury that this is a man who doesn't just collect guns, this is a man who carries them with him, who fires them in the house. He has his only [sic[5]] little tiny practice area down in the basement where he's trying to line

up his shots. This is a knowing act. And his knowledge of weapons and how to use weapons and the fact that he carries these weapons is very relevant to that."

The trial court ruled:

" ... if we're going to have an issue as to whether or not this was an accidental shot or not, or whether his aim was bad, I'm going to allow the testimony that he's got a range that he's been practicing on, at least at some point. So that'll be denied."

Appellant's second point relied on reads:

"The trial court erred and abused its discretion in overruling Appellant's Motion in Limine and in permitting the State to introduce during trial, State's Exhibits 43, 44, 45, 46, 47, and 48, six weapons which were unrelated to the murder for which Appellant was being tried because those rulings denied Appellant his right to due process and to a fair trial by a fair and impartial jury as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and by Article I, §§ 10 and 18(a) of the Missouri Constitution as well as Missouri case law in that the admission of those unconnected weapons was inherently prejudicial since they had no probative value and could not assist the jury in deciding any of the issues presented in the case."

The exhibits listed in the above point were offered by the State during the testimony of Officer Rader. The first one about which he testified was Exhibit 44. He identified it as a "Beretta, Model 21." It was "one of the [guns] under the bed."

At that point in the trial, Julie and Jody had already testified, and Rader had already testified about finding guns in the

---

**3.** The lawyer representing Appellant in this appeal concedes: "Appellate counsel has been unable to obtain copies of these two motions in limine and the court file does not show them as ever being filed."

**4.** Defense Counsel is not the lawyer representing Appellant in this appeal.

**5.** Perhaps the word "only" should be "own."

residence. Defense Counsel had registered no objection to any of that testimony.

A motion in limine preserves nothing for appellate review unless objections are made at the appropriate time during trial. *State v. Copeland*, 928 S.W.2d 828, 848[49] (Mo. banc 1996), *cert. denied*, 519 U.S. 1126, 117 S.Ct. 981, 136 L.Ed.2d 864 (1997). Because Defense Counsel voiced no objection to the testimony identified in the preceding paragraph, Appellant cannot, in this appeal, use his motion in limine as a basis for claiming the trial court erred in receiving (a) Julie's testimony about Appellant's guns and his shooting in the basement, (b) Jody's testimony about Appellant's guns and his shooting in the basement, and (c) Rader's testimony about finding guns in the residence. Furthermore, where testimony is received without objection, no issue about its admissibility is preserved for appellate review. *State v. Graves*, 588 S.W.2d 495, 499[4] (Mo. banc 1979). Consequently, inasmuch as Defense Counsel remained mute while the State presented the evidence referred to in this paragraph, Appellant cannot now question its admissibility.

After Rader identified Exhibit 44, the State offered it in evidence.

Defense Counsel said, "We'll object to it, Your Honor."

The trial court overruled the objection and received Exhibit 44 in evidence.

Specific objections are required to evidence; the objection must call the trial court's attention to the ground or reason for the objection to the proffered evidence. *State v. Lang*, 515 S.W.2d 507, 511[6] (Mo.1974). An objection such as "we object" preserves no question for appellate review. *Id.* at [7]. The trial court must be given an opportunity to rule upon an objection giving stated reasons for exclusion of the challenged evidence. *Id.*

Measured by *Lang*, Defense Counsel's objection to Exhibit 44 preserved nothing for appellate review. Consequently, Appellant's second point is denied as to Exhibit 44.

After Exhibit 44 was received, Rader identified Exhibit 46 as a gun that "came from under the bed," Exhibit 43 as a gun that "came out of the bedroom downstairs," Exhibit 45 as "a two shot Derringer" that "also came out of the bedroom," Exhibit 47 as another weapon he seized in the residence, and Exhibit 48 as "a single shot firearm" he found "in the master bedroom downstairs."

Defense Counsel objected to Exhibits 43 and 45 through 48. The trial court received those exhibits in evidence. While some of Defense Counsel's objections were not as precise as they could have been, this court shall consider them sufficient to preserve the claim of error in Appellant's second point.

Appellant maintains the exhibits listed in the preceding paragraph were immaterial to any issue at trial, as the State "knew that the Lorcin .380 found near Appellant's chair was the weapon used to shoot [Victim]." Therefore, argues Appellant, "Introduction of these unrelated weapons served no purpose other than to prejudice the jury."

Any error in receiving evidence is not considered prejudicial where similar evidence has been received elsewhere in the case without objection. *State v. Brown*, 949 S.W.2d 639, 642[5] (Mo.App. E.D.1997); *State v. Matheson*, 919 S.W.2d 553, 557–58[7] (Mo.App. W.D.1996).

Here, when the trial court received Exhibits 43 and 45 through 48, the jurors had already heard Julie's testimony about Appellant's guns and his shooting in the basement, Jody's testimony about Appellant's guns and his shooting in the basement, and Rader's testimony about finding guns in the residence. As underscored earlier in this opinion, all of that testimony was received without objection. Additionally, Exhibit 44 had already been received over an objection that was insufficient to

preserve any issue for appellate review. This court is unpersuaded that Appellant was prejudiced by Exhibits 43 and 45 through 48, as they established little, if anything, the jurors did not already know from earlier evidence.

The only prejudice Appellant identifies in the argument following his second point is that the State used Exhibits 43 and 45 through 48 as a basis for the following argument to the jury: "The defendant knew guns. Remember that wide array of guns that we showed you that were found in his house."

That argument could have been made whether or not Exhibits 43 and 45 through 48 were received in evidence. Julie's testimony about Appellant's guns and his shooting in the basement, Jody's testimony about Appellant's guns and his shooting in the basement, and Rader's testimony about finding guns in the residence supplied an ample basis for the State's argument. This court therefore rejects Appellant's complaint that the exhibits identified in this paragraph created jury prejudice against him.

There is a second reason Appellant's second point supplies no basis for reversal. A weapon found at or near the scene of a crime is usually held admissible if it "throws any relevant light upon any material matter in issue." *State v. LaRette*, 648 S.W.2d 96, 103–04[12, 13] (Mo. banc 1983), *cert. denied*, 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983). Generally, it may be said that any legally competent evidence which, when taken alone or in connection with other evidence, affords reasonable inferences upon the matter in issue, tends to prove or disprove a material or controlling issue or to defeat the rights asserted by one or the other of the parties, and sheds any light upon or touches the issues in such a way as to enable the jury to draw a logical inference with respect to the principal fact in issue is relevant and admissible. *State v. Knight*, 356 Mo. 1233, 206 S.W.2d 330, 333[9] (1947). Trial courts are given broad discretion on questions of relevancy of evidence and, without a clear showing of an abuse of that discretion, appellate courts will not interfere with the trial court's ruling. *State v. Parkhurst*, 845 S.W.2d 31, 36[11] (Mo. banc 1992). Judicial discretion is abused when a trial court's ruling is clearly against the logic of the circumstances then before it and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration; if reasonable persons can differ about the propriety of the trial court's action, it cannot be said that the court abused its discretion. *Anglim v. Missouri Pacific Railroad Co.*, 832 S.W.2d 298, 303[8] (Mo. banc 1992), *cert. denied*, 506 U.S. 1041, 113 S.Ct. 831, 121 L.Ed.2d 701 (1992).

Here, Appellant admitted in the first 911 call that he was trying to scare Victim by shooting over her head and he "pulled down a little bit low." Shortly thereafter, he told Officer Novakovich that he shot three times and "it was an accident."

The State's theory was that Appellant shot Victim intentionally, not accidentally, hence he committed murder in the second degree. Defense Counsel told the jurors in final argument: "Recklessness and carelessness and involuntary manslaughter is what we're asking.[6] . . . The state has failed to make their [second degree murder] case."

Obviously, to convict Appellant of murder in the second degree, the jurors had to accept the State's theory that Appellant shot Victim intentionally, not recklessly. The trial court's ruling on Appellant's motion in limine shows the court concluded Appellant's level of skill in handling firearms was relevant to that issue. Consequently, the court indicated it would allow the State to present evidence that Appellant had guns at the residence and prac-

---

6. Prior to the final arguments, the trial court gave the jury instructions hypothesizing mur-der in the second degree and involuntary manslaughter.

ticed shooting them. Receiving Exhibits 43 through 48 in evidence enabled the jurors to see the guns Julie, Jodie and Rader had already testified about, and to evaluate Appellant's ability to handle firearms and avoid mishaps.

Applying *LaRette*, 648 S.W.2d at 103–04[12, 13], *Knight*, 206 S.W.2d at 333[9], *Parkhurst*, 845 S.W.2d at 36[11], and *Anglim*, 832 S.W.2d at 303[8], discussed earlier in this opinion, this court cannot convict the trial court of abusing its discretion in ruling that Exhibits 43 and 45 through 48 were relevant to the issue of whether Appellant shot Victim intentionally or only recklessly. For that reason and the one set forth earlier, this court denies Appellant's second point.

The events on which Appellant bases his first point began on the first day of trial, September 7, 1999. Appellant appeared in person and with Defense Counsel. The trial court ruled on several issues (including the one that was the subject of Appellant's second point) before convening the venire at 10:17 a.m.

At 11:38 a.m., during voir dire, the trial court recessed the venire for lunch. During the recess, the trial court announced:

"Okay, we're on the record in State versus Roller. Present are all of the attorneys. Mr. Roller is not present.[7] Counsel, I understand there's something you want to take up on the record at this time."

Defense Counsel responded:

"Defense counsel is moving at this time to, with leave of Court, to enter a plea of not guilty by reason of mental disease or defect excluding responsibility on the grounds that the defendant is not able to aid counsel today, on September 7th, 1999, in his own defense. And in the alternative for a continuance to have him examined mentally prior to entering such a plea, and/or, in the alternative, for a physical examination of him

today or tomorrow to determine whether the man is physically able to endure this trial.

He is unable to aid counsel ... so we are either moving for a mental exam by entering a plea of not guilty by reason of, or we're moving for a continuance ... for twenty-four or forty-eight hours to get him examined, or third, in the alternative, we're moving to withdraw as counsel of record in this case.

Without abridging the attorney-client privilege, our client today, for the first time, has voiced complaints against us, that we haven't spent enough time with him. He's arguing with us over trial strategy, such as whether to call good character witnesses, which will kill him because of his prior arrests that he has, which a good character witness can be cross-examined about.

He is changing his story repeatedly. Without telling you what the story is, it affects how I'm going to do the voir dire and the opening statement. He is denying what is in the written depositions. He's arguing with us. He has illusions. It's almost as if he isn't here and we are not on the same wave length."

Defense Counsel reminded the trial court that Appellant was afflicted with several physical maladies and took a multitude of prescribed medications. Defense Counsel continued:

" ... I don't feel that I can tell you what he wants me to argue in the case. But I can tell you that if I argue and handle this case the way he's now ... demanding and insisting that I do it, this man would be convicted of perjury if he was charged with it. . . .

And I'm arguing with him, talking with him, and you can't get an answer out of him, and he goes on with circuitous reasoning for ten or fifteen minutes, and argues and argues. . . .

7. Nothing in the record indicates Appellant left the courtroom before 11:38 a.m. Infer-

ably, he exited during or immediately after the venire's departure.

Now, I'm not claiming that he was crazy February 23rd of '98.[8] ... I'm claiming that today he cannot aid counsel in his own defense. . . . I believe it's from the multiplier effect of all these medicines. . . .

And I realize the Court may say you should have thought of all this and everything. All I know is today he cannot aid me and I'm ineffective. And I don't mind getting out and making a refund of his money."

The prosecutor expressed skepticism, saying:

" . . . I think this is another delaying tactic. This is nothing new for Mr. Roller. And it's nothing new for [Defense Counsel] in dealing with it. If the Court has a concern, I think there is a physician that comes to the jail on a regular basis and we may arrange to have that person see him tonight or whenever the Court wants to do that, to determine if he, in fact, has some . . . condition that's clouding his ability to proceed at this point.

But it looks to me like Mr. Roller is getting around just fine. I've seen him in the hall. He doesn't seem to be having any difficulty. The Court may want to speak to him directly and see if he seems to be clear and coherent and cogent, or if this is another delaying tactic that Mr. Roller is employing, or another manipulative design, because I'm convinced that he is using his medical condition as a delaying tactic."

The trial court expressed a desire "to finish voir dire as much as we can today and have him examined tonight and have some kind of report for me in the morning."

After further discussion, the court ruled that Appellant would be immediately escorted to jail by the bailiff to undergo a physical examination by Dr. Shane. After that, Appellant would report to the office

of Dr. Meyars—"a private doctor of his own choosing"—for another physical examination at 3:30 p.m. The trial court further ordered Appellant to undergo a psychological evaluation by Dr. Burstin, a psychiatrist, at 9:00 the following morning (September 8, 1999) to determine whether "he's currently competent to stand trial and assist counsel in this case." After that, Appellant was to return to the courtroom.

The trial court informed the prosecutor and Defense Counsel that voir dire would proceed in Appellant's absence, "at least to the extent of allowing the state to ask its questions of the panel." The court added: "Once the state has completed its voir dire questions we will recess and not take up again until after we have Dr. Burstin's evaluation tomorrow morning."

Voir dire resumed at 1:58 p.m. Defense Counsel immediately asked for, and received, permission from the trial court to make a record outside the presence of the venire. During that exercise, Defense Counsel asserted Appellant "has the right to be present." Consequently, Defense Counsel objected to "going further without him being here."

The prosecutor responded:
"If he is not competent, then we're going to have a problem in any event. We'd probably have to stop the trial until he's found competent. If he is competent, then I think what the Court can conclude is that Mr. Roller is deliberately manipulating, creating the situation as his desire to delay the trial. And the Court does have the ability to proceed without Mr. Roller when it is his actions that are causing the problems."

The trial court agreed, saying:
"If he's incompetent, then we certainly won't be proceeding forward with the trial. And if he is competent, I think it can be interpreted as a device to try and delay this proceeding."

8. That remark appears inconsistent with Defense Counsel's earlier request to enter a plea

of not guilty by reason of mental disease or defect excluding responsibility.

Defense Counsel expressed concern that the venire would draw an adverse inference from Appellant's absence. The trial court said it would announce that Appellant was absent at the court's direction.

Voir dire thereupon resumed. The trial count announced that Appellant was absent at the court's direction and the venire was to draw no inference "one way or another."

The State completed its voir dire during the afternoon. The prosecutor and Defense Counsel agreed that one venire member should be stricken for cause. The court then adjourned overnight.

Proceedings resumed at 12:40 p.m. the next day, September 8, 1999. Appellant appeared in person and with Defense Counsel.

The record establishes that Dr. Shane and Dr. Meyars concluded Appellant was physically able to stand trial, and Dr. Burstin concluded Appellant, although suffering from depression and anxiety, was mentally able to proceed with trial.[9]

The trial court found Appellant "physically and mentally competent to stand trial." Accordingly, the court denied Defense Counsel's motion for continuance and motion to withdraw.

The prosecutor asked the trial court to order that Appellant be placed in custody for the duration of the trial so his condition could be monitored and jail personnel could ensure he took the proper medication.

The trial court announced it would grant the prosecutor's request based on the court's "inherent powers to preserve this trial setting." The court added Dr. Shane would be directed to make sure Appellant was "taking his medications as directed by his physicians."

Defense Counsel objected to that procedure, reminding the trial court that Appellant was free on bond.[10] After a private discussion with Appellant, Defense Counsel told the trial court Appellant indicated jail personnel "put him in the old part of the jail" which is "not air conditioned and not very pleasant." Defense Counsel asked the court to have Appellant placed "in the newer part of the jail."

The trial court reconvened the venire at 1:30 p.m., September 8, 1999, and Defense Counsel, with Appellant present, began voir dire.

During an afternoon recess, the trial court told counsel it had received a message from the jail that "they don't have access to all Mr. Roller's medications." The court asked for suggestions to solve the problem.

After conferring with Appellant, Defense Counsel recommended that the court let Appellant "go home tonight [and] direct him to bring all of his paraphernalia tomorrow."

The trial court granted that request, directing Defense Counsel to instruct Appellant to "report back tomorrow" with "all his medications."

The trial then proceeded without any further dilemma until overnight adjournment at 6:25 p.m.

Appellant appeared in person and with Defense Counsel on the morning of the third day of trial (September 9, 1999). That day passed without any problem about Appellant's mental or physical condition. During the overnight adjournment, Appellant was housed in jail.

When the trial resumed the next morning (September 10, 1999), Defense Counsel complained that Appellant "was not allowed to shave last night."

Appellant then interjected, "I wasn't allowed to bathe."

---

9. None of the three doctors testified. The results of their examinations appear in comments by counsel and the trial court.

10. Footnote 2, *supra.*

Defense Counsel also complained that Appellant "was withheld all of his pain medication."

Appellant identified the medication as Oxycodone and Valium.

The trial court assured Defense Counsel and Appellant it would investigate the matter and "make sure that doesn't happen again."

After that, the fourth day of trial passed without any further problem regarding Appellant's mental or physical condition.

The trial resumed at 9:05 a.m., September 13, 1999.[11] Defense Counsel told the trial court Appellant did not receive needed medication the previous night and was not "particularly alert to what's going on today." Defense Counsel asked for a continuance.

The prosecutor responded that Appellant "seems to be quite mobile." The prosecutor continued: "I was here when he was speaking to counsel earlier. He certainly was not making any effort to make it a secret. He appears to be quite coherent and able to carry on conversations."

The trial court remarked that Appellant's appearance seemed to be "satisfactory and not different from what I've observed throughout the trial." The court denied the motion for continuance.

Nothing else noteworthy occurred during the fifth day of trial or the sixth (and final) day, September 14, 1999.

On November 17, 1999, the trial court took up Appellant's motion for new trial. Appellant appeared in person and with Defense Counsel.

Defense Counsel argued, *inter alia*, that the trial court erred in conducting voir dire on the afternoon of the first day of trial when Appellant was absent from the courtroom, being examined by Dr. Shane and Dr. Meyars.

In denying the motion for new trial, the trial court remarked:

"He claimed to have a fever and some other problems that turned out not to be true. In my opinion his absence, although important, is able to be waived under certain conditions. And I believe that the facts did not support his claim and it was an attempt to delay the beginning of our trial and that he forfeited the right to be present during that portion of the voir dire."

Appellant's first point relied on reads:

"The trial court erred in ordering the trial to continue and the State to conduct its voir dire examination of the jury in Appellant's absence because that action violated Appellant's rights to due process, a fair trial and to be present during all critical stages of his trial as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United State Constitution, by Article I, §§ 10 and 18(a) of the Missouri Constitution, by § 546.030 and by Rule 31.03(a) V.A.M.R. in that Appellant did not voluntarily absent himself nor did he or counsel waive his right to be present during trial."

In adjudicating the above point, this court shall assume the constitutional provisions cited in the point, together with the statute and rule identified there, conferred upon Appellant the right to be present throughout the entire voir dire. *See: State v. Knese*, 985 S.W.2d 759, 776–77[51, 52] (Mo. banc 1999), *cert. denied*, 526 U.S. 1136, 119 S.Ct. 1814, 143 L.Ed.2d 1017 (1999); *State v. Smulls*, 935 S.W.2d 9, 17[11] (Mo. banc 1996), *cert. denied*, 520 U.S. 1254, 117 S.Ct. 2415, 138 L.Ed.2d 180 (1997). Although Appellant concedes the right may be waived, he insists "no waiver occurred in this case, either by Appellant personally, or by counsel."

■ An accused can lose his right to be present at trial by misconduct. *Illinois*

11. The fourth day of trial, September 10, 1999, was a Friday. No proceedings were conducted Saturday, September 11, or Sunday, September 12.

*v. Allen,* 397 U.S. 337, 342–43, 90 S.Ct. 1057, 1060–61, 25 L.Ed.2d 353 (1970). While this court finds no Missouri case factually similar to this one, three Missouri cases are helpful by analogy.

In *State v. Drope,* 462 S.W.2d 677 (Mo. 1971), the accused, free on bond, was being tried by jury for a felony. *Id.* at 679–80. After four witnesses testified, the court recessed. *Id.* at 680. The accused did not appear the following morning. *Id.* The court ordered the trial to proceed; the accused was convicted. *Id.* at 679–80. After hearing evidence on the accused's motion for new trial, the trial court found the accused intentionally shot himself to avoid attending the trial. *Id.* at 680–81. Affirming the conviction, the Supreme Court of Missouri, after an extensive discussion of an accused's right to be present at trial, concluded an accused should not be at liberty, whenever he pleases, to break up a trial already commenced. *Id.* at 683. The practical result of such a proposition would be to prevent any trial whatever until the accused permitted it. *Id.*

In *State v. Warren,* 579 S.W.2d 723 (Mo. App. E.D.1979), the accused, free on bond, was being tried by jury for a felony. *Id.* at 724. He failed to appear on the second day of trial. *Id.* at 725. After efforts to find him were unsuccessful, the court ordered the trial to proceed; the accused was convicted. *Id.* Later, the accused told the court he arrived at the courthouse on the second day, but became "scared" and left. *Id.* The appellate court held the accused voluntarily and willfully absented himself from part of his trial and thereby waived his right to be present, hence the trial court did not err in proceeding with the trial. *Id.* at 727.

In *State v. Welth,* 744 S.W.2d 889 (Mo. App. S.D.1988), the accused was being tried by jury for six felonies. *Id.* at 890. He asked to be removed from the courtroom as a protest for what he considered inadequate medical treatment in jail and the failure of the county to provide him a prescription. *Id.* at 891. The trial court granted the request. *Id.* at 890–91. The accused was convicted. *Id.* at 890. The appellate court affirmed. *Id.* at 891.

The gist of *Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353, and the three Missouri cases last discussed is that an accused, through his own conduct, can forfeit his right to be present at his trial. Furthermore, an accused has no right to abort a trial in progress. *Drope,* 462 S.W.2d at 683.

■ Here, Appellant had been free on bond some fourteen months prior to trial.[12] According to Defense Counsel's statement to the trial court on the first day of trial, Appellant had expressed no complaints to Defense Counsel during that period and had voiced no disagreements about trial strategy until voir dire commenced. Then, according to Defense Counsel, Appellant unexpectedly became argumentative and unreasonable, making it impossible for Defense Counsel to provide effective representation.

The trial court aptly observed that if Appellant's sudden change in behavior was caused by mental or physical afflictions, the trial could not proceed; however, if such behavior was feigned, it was a "device to try and delay this proceeding."

The court-ordered examinations confirmed the prosecutor's suspicion that Appellant's behavior toward Defense Counsel was a charade designed to vex Defense Counsel and induce him to seek relief that would derail the trial. That there was in fact no disaffection between Appellant and Defense Counsel was demonstrated by Appellant's remarks during the post-trial procedure required by Rule 29.07(b)(4), Missouri Rules of Criminal Procedure (1999). There, this dialogue occurred:

"THE COURT: . . . let me talk to you . . . as far as the job that your attorneys did for you in defending you in the case, were you satisfied with their services?

12. Footnote 2, *supra.*

MR. ROLLER: Yes, sir, I was.

THE COURT: Do you feel like they did a correct and proper job in representing you?

MR. ROLLER: I feel like they done an excellent job.

THE COURT: All right. Well, that was my view of it as well, but I wanted to make sure that you had a chance, if there is anything that you think was subpar from them or not up to snuff, I want you to tell me about it.

MR. ROLLER: No, sir."

That Appellant's behavior toward Defense Counsel on the first day of trial was a ploy to stop the trial is further demonstrated by Appellant's conduct after the doctors pronounced him physically and mentally able to stand trial. During the overnight adjournment after the second day of trial, Appellant was able to go home, gather his medicine, and appear at the appointed time on the third day of trial.

When it became evident that the trial court was not deceived and would go forward with the trial, Appellant began complaining about his treatment at night in jail. On the morning of the fourth day of trial, Defense Counsel, on Appellant's behalf, told the trial court Appellant was not allowed to shave. Appellant himself then protested he was not allowed bathe. Appellant also identified two medications that were withheld. At the start of fifth day of trial, another complaint about lack of medication prompted Defense Counsel to again request a continuance. The trial court denied the request, noting that Appellant's appearance did not seem different from what the court had observed throughout the trial.

In sum, besides receiving the doctors' verbal reports, the trial court had the opportunity to observe Appellant throughout the six days of trial. The court's comments in denying Appellant's motion for new trial show the court believed Appellant's behavior on the first day was a stratagem to postpone the trial. This court holds the record supports the trial court's finding.

Consequently, whether the complaint in Appellant's first point mandates reversal of the judgment and a new trial hinges on whether, by his guileful conduct, Appellant waived his right to be present on the afternoon of the first day of trial during the State's voir dire.

Had Appellant engaged in disruptive behavior that made it impossible to conduct his trial in an orderly and decorous manner, he could have been removed from the courtroom. *Allen*, 397 U.S. at 343–47, 90 S.Ct. at 1060–63; *State v. Moton*, 733 S.W.2d 449, 452[5] (Mo.App. E.D.1986). Had that occurred, Appellant would not have been present during the State's voir dire.

Here, Appellant's conduct on the first day of trial did not offend the decorum of the proceedings or create a disruption in the jury's presence, but it did prevent Defense Counsel from conferring in a meaningful way with Appellant about voir dire. During Defense Counsel's entreaty to the trial court, Defense Counsel lamented: "We've asked [Appellant] to help us pick the jury, to write things down, which he is literate.... And he is unable to aid us one iota in helping to pick the jury. He isn't rational. And we are ineffective as a result of it."

Faced with Defense Counsel's announced plight, the trial court had to determine whether Appellant's demeanor toward Defense Counsel was genuine or staged. The court enlisted the doctors to find out. Obviously, Appellant could not be in the courtroom when Dr. Shane and Dr. Meyars were examining him; consequently, he missed the State's voir dire. However, according to Defense Counsel, Appellant's attitude was making it impossible to confer about voir dire anyway.

The question this court must decide is whether Appellant should now be rewarded for his scheme by obtaining a new trial.

This court believes not. To award a new trial in this case would give defendants in criminal cases carte blanche to fabricate day-of-trial crises with their lawyers in the hope of forestalling the trial. Justice Brennan, concurring in *Allen*, wisely observed:

> "To allow the disruptive activities of a defendant ... to prevent his trial is to allow him to profit from his own wrong. The Constitution would protect none of us if it prevented the courts from acting to preserve the very processes that the Constitution itself prescribes."

397 U.S. at 350, 90 S.Ct. at 1064.

This court holds Appellant, by his own artifice, relinquished his right to be present on the afternoon of the first day of trial.[13] His first point is denied, and the judgment is affirmed.

BARNEY, C.J., and PREWITT, J., concur.

PER CURIAM.

In a motion for rehearing or, in the alternative, to transfer this case to the Supreme Court of Missouri, Appellant avers *State v. Drope*, 462 S.W.2d 677 (Mo. 1971), one of the cases relied on by this court in denying Appellant's first point, "was reversed by the United States Supreme Court in *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975)." That averment is misleading.

After the Supreme Court of Missouri affirmed the judgment in *Drope*, the accused evidently filed no petition for a writ of certiorari in the Supreme Court of the United States. Instead, the accused commenced a proceeding for post-conviction relief under former Rule 27.26.[14] 420 U.S. at 168, 95 S.Ct. at 902. The motion court denied relief; the Missouri Court of Appeals affirmed. 420 U.S. at 169, 95 S.Ct. at 903. The Supreme Court of the United States granted certiorari. 420 U.S. at 171, 95 S.Ct. at 903.

The Supreme Court of the United States held the accused's "suicide attempt," coupled with the information about his mental condition prior to trial and the testimony of his wife at trial, "created a sufficient doubt of his competence to stand trial to require further inquiry on the question," hence the trial court should have suspended the trial until a mental evaluation could be made. 420 U.S. at 180–81, 95 S.Ct. at 908.

Having decided that, the Supreme Court of the United States did not reach the issue of whether it was "constitutionally impermissible" to conduct the remainder of the trial in the accused's absence. 420 U.S. at 182, 95 S.Ct. at 909. On that subject, the Supreme Court of the United States said: "However, even assuming the right to be present was one that could be waived, what we have already said makes it clear that there was an insufficient inquiry [into the accused's mental condition] to afford a basis for deciding the issue of waiver." 420 U.S. at 182, 95 S.Ct. at 909.

This court holds the decision of the Supreme Court of the United States in *Drope*

---

13. *Compare People v. Burnside*, 254 A.D.2d 98, 679 N.Y.S.2d 110 (N.Y.A.D. 1 Dept.1998), where the defendant sought reversal of his conviction of multiple felonies because he was not present at a suppression hearing. The appellate court held:

> "Defendant's right to be present at the suppression hearing was not violated by the hearing court's refusal to adjourn the proceedings on a particular Friday court session at which defendant opted not to appear, purportedly for religious reasons. Since the hearing court was clearly warranted in finding that the religious excuse

> offered by defendant to circumvent a court appearance was merely a sham, particularly considering defendant's prior Friday court appearances, there was ample support in the record for the court's conclusion that defendant had voluntarily waived his right to be present."

679 N.Y.S.2d at 111[4].

14. Rule 27.26 was repealed effective January 1, 1988, by order of the Supreme Court of Missouri. Vol. 721–722 S.W.2d Missouri Cases, pp. XXV–XXXVII.

does not compel reversal in the instant case for three reasons.

First, the accused in *Drope* had been examined by a psychiatrist before trial; the psychiatrist had suggested treatment. 420 U.S. at 164, 95 S.Ct. at 900. Appellant's post-opinion motion in the instant case does not aver he had ever been examined by a psychiatrist until the court-ordered examination by Dr. Burstin during the recess on the second day of trial.

Second, no evaluation of the accused's mental condition occurred during—or even after—the trial in *Drope*, whereas in the instant case the trial court immediately arranged for Appellant to be examined by two physicians during the afternoon of the first day of trial, and by psychiatrist Burstin the next morning. After the State completed voir dire (during Appellant's absence), the trial court recessed the trial until the court received the reports of the examinations. After finding Appellant physically and mentally competent to proceed, the trial court resumed the trial and, with Appellant present, Defense Counsel commenced voir dire. From then on, Appellant was present throughout the trial.[15]

Third, the Supreme Court of the United States did not imply in *Drope* that an accused could not waive his right to be present during part of his trial. The reason the Supreme Court of the United States vacated the conviction in *Drope* appears at the end of its opinion:

> "The question remains whether petitioner's due process rights would be adequately protected by remanding the case now for a psychiatric examination aimed at establishing whether petitioner was in fact competent to stand trial in 1969. Given the inherent difficulties of such a nunc pro tunc determination under the most favorable circumstances ... we cannot conclude that such a procedure would be adequate here.[16] The State

is free to retry petitioner, assuming, of course, that at the time of such trial he is competent to be tried."

420 U.S. at 183, 95 S.Ct. at 909[19] (citations omitted).

If Appellant believes Defense Counsel's complaints to the trial court about Appellant's intransigence on the first day of trial were inaccurate or exaggerated, or that Defense Counsel, by voicing the complaints, rendered ineffective assistance or caused Appellant to involuntarily lose his right to be present during the State's voir dire, Appellant can present those claims in a proceeding under Rule 29.15, Missouri Rules of Criminal Procedure (2000). However, given the existing record, this court adheres to its holding that the trial court did not err in finding that Appellant, by his own conduct, relinquished his right to be present during the State's voir dire.

Appellant's post-opinion motion is denied.

---

**15.** As this court understands the transcript, the State's voir dire during which Appellant was absent consumed less than two hours of the six-day trial.

**16.** The Supreme Court of the United States decided *Drope* in 1975, some six years after the trial.